IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TINA M. CORDOBA-BRINKLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | CIV-05-155-F |
| v. ) | |
| ) | |
| JO ANNE B. BARNHART, ) | |
|   Commissioner of Social Security ) | |
|    Administration, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her application for a closed period of supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___). The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), and the parties have briefed the issues. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background

Plaintiff protectively filed her application for supplemental security income ("SSI") benefits on August 13, 2002, alleging she became disabled on May 31, 2000. (TR 49-51, 74).

Plaintiff alleged that she was unable to work because of "legs cramps [sic] that cause bruising," "hips cramping," and an inability to sit or stand for "any length of time." (TR 65). Plaintiff also described "mental stress" and "depress[ion]," a "disease" in her eyes which adversely affects her ability to focus, memory loss, shoulder and neck "cramping," and lack of strength. (TR 72, 85, 96). Plaintiff's application was administratively denied. (TR 25, 26). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Levine ("ALJ") at which Plaintiff and a vocational expert ("VE") testified. (TR 216-243). During this hearing, Plaintiff amended her application to one seeking SSI benefits for a "closed period" of time between August 13, 2002, and April 1, 2004, which is the date she stated she began working as a cashier in a convenience store.[1] (TR 220-221). During this relevant period of time, Plaintiff testified that she was disabled due to fibromyalgia, which caused pain and muscular cramping in her legs, shoulders, neck, hips, and joints, and decreased her muscular strength. (TR 228-230). Plaintiff also testified that her medical condition caused depression characterized by a loss of interest in activities, fatigue, and short-term memory loss. (TR 232). At the hearing the VE testified concerning the requirements of Plaintiff's previous jobs, Plaintiff's transferable skills gained from these past

---

[1] The record contains a hand-written letter from a lay individual addressed to the ALJ in which the individual advised the ALJ that Plaintiff would be appearing at a hearing before the ALJ on May 11th and that Plaintiff was "cheating the social security system" because she was working full time in a "small bar." (TR 104-105). The individual further states in this letter that during Plaintiff's job she carried two 30-packs of beer and served beer to customers, and that Plaintiff would "be limping in front of you" and she did this "when she wants sympathy."(TR 104-105). It is not clear from the record, but this letter may have prompted Plaintiff to amend her application to seek a "closed period" of benefits. In any event, the letter appears to have provided credible information concerning Plaintiff's ability to work at or closely preceding the time of the hearing.

jobs, and the availability of jobs for a hypothetical individual who could perform light work with a sit/stand option. (TR 238-242). The ALJ subsequently issued a decision in which the ALJ found that during the relevant period Plaintiff had severe impairments due to "shoulder cramp, major depression, moderate, single episode without psychosis, [and] adjustment disorder with depressed mood." (TR 16). Despite these impairments, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work with the opportunity to sit/stand at will. (TR 18). In light of her RFC for work and the VE's testimony, the ALJ concluded that Plaintiff had the RFC during the relevant period to perform her past relevant work as a restaurant cashier and, alternatively, to perform other jobs available in the economy, including the jobs of game room attendant, photo lab worker, counter attendant at a dry cleaners, or clerk in a liquor store. (TR 18-19). The ALJ denied Plaintiff's application for benefits based on these findings. (TR 19-20). The Appeals Council declined Plaintiff's request for a review of the administrative decision (TR 4-6). Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's decision.

Plaintiff contends that the ALJ erred by failing to properly analyze Plaintiff's mental impairments pursuant to 20 C.F.R. § 416.920a and erred by failing to properly analyze the opinion of Plaintiff's treating physician, Dr. Cail. Plaintiff further contends that there is not substantial evidence to support the ALJ's RFC finding because the ALJ did not include any restrictions related to Plaintiff's severe mental impairments. Defendant Commissioner responds that no error occurred with respect to the ALJ's evaluation of the evidence and that

there is substantial evidence to support the Commissioner's decision.

II. Standard of Review

Judicial review of this Complaint is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991). The court will look to the record as a whole to determine whether the evidence which supports the Commissioner's decision is substantial in light of any contradicting evidence. Nieto v. Heckler, 750 F.2d 59, 61 (10th Cir. 1984); Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983)(*per curiam*). If the Commissioner fails to apply the correct legal standard or substantial evidence does not support the Commissioner's decision, the court may reverse the Commissioner's findings. Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984)(*per curiam)*. The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). To find that the Commissioner's decision is supported by substantial evidence in the record, there must be sufficient relevant evidence in the record that a reasonable person might deem adequate to support the ultimate conclusion. Bernal v. Bowen, 851 F.2d 297, 299 (10th Cir. 1988).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§416(i), 1382c(a)(3)(A). The

Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. § 416.920(b)-(f) (2005); see also Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988)(describing five steps in detail). The claimant bears the initial burden of proving that she has one or more severe impairments. 20 C.F.R. § 416.912 (2005); Turner v. Heckler, 754 F.2d 326, 328 (10th Cir. 1985). Where the plaintiff makes a *prima facie* showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show "the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." Turner v. Heckler, 754 F.2d at 328; Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984). In this case, the Commissioner's decision was made at step four of the requisite sequential procedure, and at this step the Plaintiff bears the burden of showing that she is not capable of performing any of her past relevant jobs, either as she performed them or as they are typically performed in the national economy. See Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045, 1051 (10th Cir. 1993).

III. Evaluation of Mental Impairments

Plaintiff first contends that the ALJ erred by failing to properly evaluate the evidence with respect to Plaintiff's mental impairments. Once the ALJ found that Plaintiff had severe mental impairments, Plaintiff contends the ALJ was required to, but failed to, evaluate the severity of the functional limitations caused by those impairments upon Plaintiff's activities of daily living, social functioning, her concentration, persistence, and pace, and any episodes of decompensation as required by 20 C.F.R. § 416.920a(c).

The ALJ found that during the relevant period Plaintiff had severe mental impairments due to a "single episode" of major depression and an adjustment disorder with depressed mood. (TR 16). Because of this finding, the ALJ was required to "follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § [416.920a] and the Listing of Impairments and document the procedure accordingly." Cruse v. United States Dep't of Health & Human Servs., 49 F.3d 614, 617 (10th Cir. 1995)(internal citation omitted). Under this procedure, the ALJ must first evaluate the evidence to determine whether the claimant has a medically-determinable mental impairment. 20 C.F.R. § 416.920a(b)(1). The ALJ must then evaluate the degree of functional loss resulting from the impairment(s). 20 C.F.R. § 416.920a(b)(2). The ALJ is required to "incorporate the pertinent findings and conclusions" in his or her decision, 20 C.F.R. §416.920a(e)(2), and relate the medical evidence to those conclusions. Cruse, 49 F.3d at 618.

The ALJ's decision reflects her consideration of the evidence, including the medical evidence and non-medical evidence, with respect to the issue of mental impairments. The ALJ found that Plaintiff has severe mental impairments, but that those impairments are not severe enough to satisfy the listed impairment for affective disorders. The ALJ's decision thereafter reflects consideration of the evidence with respect to the issue of functional limitations related to the Plaintiff's severe mental impairments. The ALJ noted that

> [t]he claimant had only a remote history of referral to counseling which she did not follow and does not take antidepressant medication. Her activities of daily living are limited by physical complaints not mental. She is able to live alone and raises dogs. She cares for her own personal needs, cooks her meals and does

> routine household chores, limited only by physical pain which also disturbs her sleep. She shops regularly when she has the money. She does not read but watches television and spends time caring for her poodles she raises. She visits her grandchildren 3 or 4 times a week, is able to drive, and goes to a group therapy weekly with a friend. There is no indication of any mental illness limiting claimant.

(TR 16-17). The ALJ also stated that she "generally agrees" with the medical assessments in the record prepared by the state agency medical consultants. (TR 18). The record reflects that a medical consultant completed a psychiatric review technique form in March 2003 in which the consultant found that Plaintiff's dysthymic disorder had resulted in only mild restrictions of her activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (TR 194-207). The ALJ clearly expressed her consideration of the issue of functional limitations related to Plaintiff's mental impairments and, relying on Plaintiff's description of her usual daily activities completed in September 2002 and the medical consultant's assessment, the ALJ found that Plaintiff's mental impairments had not caused functional limitations in the areas deemed relevant to this issue. No error occurred in this regard.

Plaintiff next contends that the ALJ's evaluation of her functional limitations is not supported by the evidence. Plaintiff refers to her subjective allegations of symptoms reported to a counselor in August 2002 when she sought antidepressant medication at a community mental health center. (TR 131-133). At this evaluation for possible treatment, Plaintiff reported she was experiencing "several stressors in her life" at that time, including a

separation from her husband and resulting financial strain, the death of her father, her daughter's action in signing over parental rights to Plaintiff's grandson to the state, the grandson's biological father's action in seeking custody of the grandson, and Plaintiff's coinciding fear that she would not see her grandson again. (TR 131). Plaintiff was given samples of an anti-depressant medication and referred for treatment to a clinic closer to her home. (TR 137-138). The ALJ recognized that Plaintiff sought mental health treatment for depression in August and September 2002,but the ALJ evaluated this evidence in the context of the record as a whole, which reflects that Plaintiff attended only a few counseling sessions at a community mental health clinic in September and early October 2002 before she stopped attending her scheduled counseling sessions and never sought further mental health treatment. (TR 136-138, 161-168, 181).

Plaintiff refers to the counselor's assessment in September 2002 of Plaintiff's "GAF" score. Plaintiff's Brief, at 11. The GAF score is commonly used by mental health professionals as a measure of the client's level of functioning at that time. It is a "subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." Langley v. Barnhart, 373 F.3d 1116, 1122 n. 3 (10th Cir. 2004). Standing alone, however, a low GAF score is not necessarily evidence of a mental impairment which seriously interferes with a claimant's ability to work. Lee v. Barnhart, 117 Fed. Appx. 674, 2004 WL 2810224, *3 (10th Cir. Dec. 8, 2004)(unpublished op.). The counselor who evaluated Plaintiff at the Red Rock Behavioral Health Services clinic in September 2002 noted a GAF of 35. (TR 176). However, a clinic counselor noted that at

Plaintiff's first individual counseling session in September 2002 her mood was elevated, her affect seemed appropriate, and Plaintiff reported she was feeling less depressed. (TR 168). In two subsequent group counseling sessions during October 2002, the clinic's counselor noted that Plaintiff's affect and mood were in the normal range, her behavior was appropriate, her speech was normal, and during interaction she was cooperative and initiated discussion. (TR 166, 167). Plaintiff did not appear for scheduled counseling sessions after October 8, 2002, and she was eventually discharged from treatment for non-compliance in November 2002. (TR 161-165, 181). Thus, because the record reflects Plaintiff's initial depression symptoms improved very soon after she sought mental health treatment in August and September 2002, the ALJ did not err in failing to attach significance to the one-time low GAF score given Plaintiff in September 2002.

Plaintiff also refers to the consultative mental status evaluation of her conducted by Dr. Danaher for the agency in February 2003. (TR 189-192). The ALJ's decision reflects consideration of the report of this consultative examiner, and the ALJ's summary of this evaluation is consistent with the report by Dr. Danaher appearing in the record, which shows that Plaintiff exhibited unimpaired mental functioning except for "some difficulty with distinguishing relevant from irrelevant details," that Dr. Danaher diagnosed Plaintiff as having a dysthymic disorder, and that Dr. Danaher assessed a GAF score of 55. (TR 16, 189-192). As the ALJ noted, Dr. Danaher suggested to Plaintiff she might wish to consider a possible trial of a different antidepressant medication in light of her statement that she voluntarily stopped taking the antidepressant medication previously given to her because of

negative side effects. (TR 192). "GAF scores of 51-60 indicate 'moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2005)(quoting the Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000)("DSM-IV"). Dr. Danaher did not find that Plaintiff's functional ability in the areas of social functioning was limited or that her ability to work was limited at all by any mental impairment. Given the absence of evidence of ongoing treatment for a mental impairment and the absence of evidence of functional limitations related to a mental impairment, and in light of the supporting evidence in Danaher's report, there is substantial evidence in the record to support the ALJ's finding Plaintiff has no significant functional limitations resulting from her mental impairments.

IV.  Treating Physician's Opinion

Plaintiff contends that the ALJ erred in rejecting the opinion of Plaintiff's treating physician, Dr. Cail, as to the existence and severity of her physical impairments and their effect on her ability to work. The medical record shows that Plaintiff sought medical treatment from Dr. Robison in July 2001 for joint pain and calf and thigh muscle spasms. (TR 124-125). Plaintiff was prescribed muscle relaxant medication. (TR 125). In August 2001, Plaintiff returned to Dr. Robison again complaining of leg muscle spasms and cramps. Although a physical examination was reportedly normal, Dr. Robison prescribed medication, including quinine sulfate, for "cramp of limb." (TR 122-123). Plaintiff then switched

physicians and sought treatment from Dr. Whinery, complaining of "aching" and nausea for which medication was prescribed. (TR 130). Dr. Whinery's notes of treatment of Plaintiff in September 2001 for swelling in her right hand after falling on a cactus, and on November 15, 2001, and May 14, 2002, are largely illegible. (TR 129-130). Plaintiff first sought treatment from Dr. Cail in August 2002, four months after she filed her application for benefits. (TR 188). Dr. Cail's notes reflect that Plaintiff described leg cramps and easy bruising and that a physical examination showed no atrophy or loss of strength and good range of motion in all extremities. (TR 188). Dr. Cail prescribed quinine and "TED" hose for leg cramps. (TR 188). In September 2002, Plaintiff returned to Dr. Cail complaining of a headache beginning that morning with no dizziness, a feeling of ringing in her ears, and a feeling of fatigue the previous day. (TR 187). Dr. Cail noted he prescribed medication for a headache and that Plaintiff exhibited normal findings on physical examination. (TR 187). In October 2002, Plaintiff returned to Dr. Cail complaining of right hip "popping" and pain. (TR 186). Dr. Cail noted he planned to obtain an x-ray of Plaintiff's right hip and back and laboratory testing. (TR 186). Plaintiff next saw Dr. Cail in November 2002. She complained of pain in her right shoulder and elbow, worse with lifting or turning, occasional pain in her left arm "but not as bad," sharp pain in her back, worse with range of movement, achiness in both legs, swelling in her right knee at night, and increased pain with walking. (TR 185). Dr. Cail noted Plaintiff complained of pain with right shoulder movement and right knee movement and that she exhibited pain with palpation in her cervical and lumbar spines. (TR 185). Dr. Cail diagnosed Plaintiff as having fibromyalgia and varicose veins, for which he

prescribed medications. (TR 185). In a letter dated November 27, 2002, and addressed "To Whom It May Concern," Dr. Cail stated that Plaintiff "suffers from numerous health problems," including "frequent leg cramps, causing recurrent pain," "troubling symptoms of pain and weakness involving a unilateral distribution of both the upper and lower extremity, worrisome for a neurologic disorder," and fibromyalgia causing "constant fatigue and weakness, and ...constant pain in her joints and muscles." (TR 184). Dr. Cail stated that Plaintiff "is unable to hold down any type of normal labor" and "would require more than the normal amount of rest and accommodation that a typical job would provide." (TR 184). He also recommended further evaluation of Plaintiff "to determine the cause and extent of all her problems." (TR 184). The only other medical evidence in the record is the report of a chiropractor dated July 31, 2003, indicating he suggested a treatment plan, including "adjustments," for Plaintiff's fibromyalgia. (TR 208-215). The ALJ noted in her decision that this report is not considered to be credible because it was provided by a chiropractor. (TR 18). The agency has determined that chiropractors are not considered acceptable sources for medical evidence in a disability proceeding. 20 C.F.R. § 416.913(a)(2005).

The ALJ recognized the medical records and opinion by Dr. Cail in her decision. (TR 16-17). The ALJ rejected the "diagnosis of fibromyalgia" because Dr. Cail's treatment notes showed Plaintiff exhibited normal findings on examination and "nothing to establish this diagnosis." (TR 17). The ALJ also stated that "there were no other findings to support" the diagnosis, and that the condition "apparently was assessed only by a chiropractor..." (TR 17). The ALJ properly disregarded Dr. Cail's statement with respect to the severity of Plaintiff's

physical impairments and their effect on her ability to work. As the ALJ noted in her decision, Plaintiff had only been treated by Dr. Cail for three months at the time he opined she was unable to work due to fibromyalgia. Dr. Cail's notes of treatment of Plaintiff did not provide evidence to support the diagnosis of fibromyalgia, much less an opinion that Plaintiff was unable to work as a result of fibromyalgia, and there was no other evidence in the record to support either the diagnosis or the physician's opinion regarding the Plaintiff's ability to work as a result of this condition. See Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)(ALJ is required to give a treating physician's opinion "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "consistent with other substantial evidence in the record")(quotation omitted). No error occurred in this regard.

V. RFC

At the fourth step of the requisite evaluation procedure, the ALJ must "make findings regarding 1) the individual's [RFC], 2) the physical and mental demands of prior jobs or occupations, and 3) the ability of the individual to return to the past occupation, given his or her [RFC]." Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993). The assessment of a claimant's RFC necessarily requires a determination by the ALJ of the credibility of the claimant's subjective statements. "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to credibility

13

should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)(footnote omitted).

The ALJ found that despite her severe impairments Plaintiff has the RFC to perform light work with the opportunity to sit or stand at will. Plaintiff contends that the ALJ erred by failing to include in this RFC finding any restrictions related to Plaintiff's mental impairments. Plaintiff contends that the ALJ should have found Plaintiff's mental impairments interfere with her ability to deal with other people, including the public. To support this assertion, Plaintiff refers to her symptoms reported to a counselor in August 2002, the GAF scores assessed for Plaintiff by a counselor in September 2002, and the GAF score assessed for Plaintiff by Dr. Danaher, the consultative examiner, in February 2003. As stated previously, however, low GAF scores standing alone do not indicate mental impairments which seriously interfere with the ability to work.

The ALJ found that Plaintiff's allegations of severe and disabling physical and mental impairments were not consistent with the medical and non-medical record. The ALJ specifically referred to Plaintiff's own statements concerning her usual daily activities. (TR 17). The ALJ also referred to the medical evidence and reasoned that Plaintiff's "problems seemed intermittent and to be resolved with treatment." (TR 18). The ALJ relied on the record with respect to mental health treatment, and there is substantial evidence in the record supporting the ALJ's RFC finding.

The record did not show that Plaintiff's ability to work was limited by a mental

impairment during the relevant period. Plaintiff sought treatment for depression in August 2002 and was diagnosed as having a single episode of major depression, an adjustment disorder with depressed mood, and, later, a dysthymic disorder. (TR 136, 175, 192). She only attended counseling sessions for about a month and failed to continue mental health treatment or take antidepressant medications following this short term of treatment. Her treating counselor noted Plaintiff's subjective statement that her depression problems were associated with several family-related stressors that began 5 to 6 months prior to her treatment. (TR 173, 175, 176). The notes of treating counselors and the consultative psychological examiner do not reflect findings consistent with a mental impairment adversely affecting Plaintiff's ability to work. Although her counselor noted Plaintiff isolated herself pursuant to her subjective statements, other statements by Plaintiff in the record reflect largely normal contacts with other people, including a close relationship with her daughter, frequent visits with grandchildren, and weekly interactions with friends and family, including her husband despite their separation. (TR 82, 84, 85, 86,130, 179, 180). Plaintiff also stated that she raised and sold dogs during the relevant period. (TR 52, 54). The ALJ did not err by failing to include in the RFC finding work-related restrictions in dealing with the public or other social functioning.

      Relying on the RFC finding and the VE's testimony that an individual with an RFC for light work with a sit/stand option could perform Plaintiff's previous job as a restaurant cashier, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because she is capable of performing this previous job. There is substantial

evidence in the record to support this ultimate finding of nondisability. Accordingly, the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's application for supplemental security income benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before      January 5th     , 2006, in accordance with 28 U.S.C. §636 and LCvR 72.1. The parties are further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. Moore v. United States, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

ENTERED this     16th     day of     December     , 2005.

*[signature]*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE